UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ROBERT HALE, III | CIVIL ACTION |
| VERSUS | NO: 12–1515 |
| M.J.J.K., LLC, ET AL. | SECTION "H"(4) |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This is a civil action for breach of contract. The dispute involves land owned by Defendants on both the north (the "Northside Property") and the south (the "Southside Property") sides of the Gulf Intracostal Waterway in Houma, Louisiana. Plaintiff Robert Hale, III alleges Defendants breached two oral agreements to provide real estate commissions on the Northside and Southside Properties (sometimes referred to as the "Northside Agreement" and the "Southside Agreement," respectively). Defendants dispute the terms of both agreements and deny any liability to Hale.

This matter was tried before the undersigned without a jury. Having considered the

1

evidence admitted at trial and the arguments of counsel, the Court announces its Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52.  To the extent a finding of fact constitutes a conclusion of law, the Court adopts it as such.  To the extent a conclusion of law constitutes a finding of fact, the Court adopts it as such.

**FINDINGS OF FACT**

Pursuant to the Northside Agreement, Hale seeks one lot (or the cash equivalent thereof) in each of four developed subdivisions on the Northside Property.  Defendants contend the Northside Agreement was modified, whereby Hale agreed to accept a certain 5.526 acres of land in lieu of any further compensation in immovable property.  Under the terms of the Southside Agreement, Hale seeks a 5% commission on the sale of the Southside Property, even though he was not the procuring cause.  Defendants contend the listing agreement was non-exclusive and that therefore Hale is not entitled to any commission. The Court separates its findings with respect to each property.

**I. Northside Property**

1. Hale is an Alabama citizen licensed to broker real estate in Louisiana.

2. The Defendants are Patrick McLeary ("P. McCleary"), Barbara McLeary ("B. McLeary") (collectively the "McClearys"), and M.J.J.K., LLC ("MJJK").  The McClearys are Louisiana citizens.  MJJK is a citizen of both Louisiana and Mississippi.

3. The McClearys own the Northside property.

4. On September 24, 1996, the McClearys entered into a written agreement with Hale to sell a tract of the Northside Property. The agreement contained an option to purchase adjoining tracts of land within one year of parish approval. In the event the options were not exercised, the agreement provided that Hale would be reimbursed his proportional cost for a sewer lift station he planned to construct.

5. Hale ultimately purchased 19 acres under the agreement but did not exercise any options.

6. Hale developed those 19 acres into residential subdivisions known as Mulberry Gardens Phases 1 and 2.

7. Hale paid $82,843.90 for installation of a sewer lift station that would service both Mulberry Gardens Phases 1 and 2, as well as future developments.

8. The McClearys subsequently retained Hale to develop and market the tracts of land on which he previously held options. Under the Northside Agreement, Hale would be compensated with a lot in each subdivision developed (also referred to as a "phase") and a 5% commission for each lot sold, irrespective of whether he was the procuring cause. The Northside Agreement was never reduced to writing.

9. It was commonplace for Hale and the McClearys to conduct real estate transactions on the basis of exclusive oral listing agreements. Hale and P. McCleary had a very close personal relationship and trusted each other.

10. On March 27, 2000, Mulberry Estates Phase A was approved by the Parish government.

11. Some time between March 27, 2000 and June 6, 2000, Hale approached P. McCleary to discuss the transfer of a lot in Phase A, as per the Northside Agreement. Hale also requested the McClearys transfer a certain tract of land in lieu of a lot in subsequent phases and repayment of Hale's proportional cost of the sewer lift station. P. McCleary discussed this proposal with his wife and business partner, B. McCleary. The McClearys ultimately agreed to the modification but still pledged to pay Hale an exclusive listing commission of 5% for each lot sold on the Northside Property.

12. Hale sought to modify the Northside Agreement, because the McClearys were uncertain whether they would continue to develop subdivisions on the Northside Property.[1] Hale preferred to eschew this contingency and acquire land immediately.

13. On June 6, 2000, the McClearys transferred to Hale (1) one lot in Phase A, and (2) 5.526 acres of undeveloped land on the Northside Property. Hale did not transfer any money in return.

14. Despite their previous reservations, the McClearys elected to proceed with further development of the Northside Property, specifically, Mulberry Estates Phases B, C, M, and Mulberry Gardens Addendum 1-Phase B (collectively the "Mulberry Subdivisions").

---

[1] Under the original Northside Agreement, Hale would not receive any more immovable property if the McClearys declined to develop future subdivisions.

15. Mulberry Estates Phase B was approved by the parish government on March 4, 2002. Hale received a 5% commission on each lot sold. The last lot was sold on March 16, 2009.

16. Mulberry Gardens Addendum 1-Phase B was approved by the parish government on May 22, 2000. Hale received a 5% commission on each lot sold. The last lot was sold on September 12, 2008.

17. Mulberry Estates Phase C was approved by the parish government on July 18, 2003. Hale received a 5% commission on each lot sold. The last lot was sold on January 6, 2012.

18. Mulberry Estates Phase M was approved by the parish government on August 30, 2007. All lots in Phase M were sold to a single purchaser on January 15, 2009. Hale received a 5% commission directly from the purchaser.

19. The McClearys did not transfer a lot to Hale in *any* of the Mulberry Subdivisions.

20. Hale did not make formal demand for a lot in the Mulberry Subdivisions until the filing of his third amended complaint on August 5, 2013.[2]

21. Hale's testimony regarding his failure to timely request the transfer of lots in the Mulberry Subdivisions is not credible. Hale testified that he did not demand lots in the Mulberry Subdivisions in his previous complaints, because he did not think P. McCleary would "tell the truth." This explanation makes little sense. As a preliminary matter, it is difficult to

---

[2] The pleading itself is dated August 1, 2013.

5

fathom how anticipating an adversary's truthfulness could influence the decision to file suit. If the parties agreed on the compensation owed, there would be little reason to file suit in the first place. Even assuming *arguendo* that an adversary's veracity is a legitimate consideration when filing suit, Hale cannot explain why he trusted P. McCleary to tell the truth about the Southside Agreement but not the Northside Agreement. Hale also cannot explain what changed between the filing of the second complaint and the third complaint that made him believe P. McCleary would be truthful about the Northside Agreement. Hale's testimony on these matters severely impugns his credibility as a witness.

22. Following development and sale of the Northside Property, Hale invited P. McCleary to be a partial owner of the Terracane subdivision—a separate subdivision owned and developed by Hale.[3] P. McCleary declined.

23. The proportional cost to Hale of the sewer lift station is $46,973.00.

**II. Southside Property**

24. The McClearys and MJJK owned the Southside Property. MJJK has six members: the McClearys and four of their children.

25. At some point prior to 2006, the McClearys and Hale entered into an oral listing agreement with respect to the Southside Property—the Southside Agreement—whereby Hale would

---

[3] The record is unclear as to the location of the Terracane subdivision.

      be entitled to commission if he was the procuring cause of a sale.

26.     Pursuant to this agreement, Hale approached the McClearys with a prospective buyer, Nautilus Crane. The sale did not materialize.

27.     On March 31, 2006, the McClearys sold a tract of land on the Southside Property to Manson Gulf, LLC ("Manson Gulf"). Hale had no involvement whatsoever with this sale and did not receive a commission.

28.     Subsequent to the sale, Hale engaged in various marketing activities to locate a potential buyer for the Southside Property. Those efforts were unsuccessful.

29.     On April 19, 2010, P. McCleary entered into an open listing agreement with Carl Heck ("Heck"). Pursuant to the agreement, Heck would receive a 5% commission if he was the procuring cause of a sale. The agreement was memorialized in writing.

30.     The McClearys have never paid a 10% commission on the sale of any of their real estate holdings.

31.     In early 2010, a representative of the Callais family contacted P. McCleary and expressed interest in purchasing the Southside Property.

32.     P. McCleary subsequently contacted Hale, who explained that the Callais family owned a bank that previously extended financing to the McClearys in a time of need. Upon recognizing the identity of the prospective purchasers, P. McCleary informed Hale that he intended to negotiate the sale directly with the Callais family. The parties did not discuss

Hale's compensation during this conversation.

33. Approximately two weeks prior to closing, P. McCleary and Hale further discussed the pending sale to the Callais family. P. McCleary advised that he was unsure as to the amount of Hale's compensation but that Hale would receive something. Hale responded that the McClearys had been a "God send" and that he would gladly accept any amount of compensation the McClearys offered.

34. On December 21, 2011, the McClearys and MJJK sold a tract of the Southside Property to the Callais family for $8 million.

35. Hale was not the procuring cause of the sale.

36. Hale was not present at closing.

37. On December 22, 2011, the McClearys sent Hale a check for $25,000 as compensation for his unsuccessful efforts in procuring a buyer for the Southside Property.

38. On January 8, 2012, Hale sent a letter to the McClearys disputing the amount of his compensation.

39. On February 2, 2012, Hale sent a formal demand letter to the McClearys for $400,000 and an invoice for same.

40. The McClearys did not pay the invoice.

8

**CONCLUSIONS OF LAW**

The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332, which confers on the federal district courts original jurisdiction when the parties are completely diverse, and the amount in controversy exceeds $75,000. Venue is proper, because a substantial part of the events or omissions giving rise to the claims occurred in the Eastern District of Louisiana. *See* 28 U.S.C. § 1391(b)(2).

I.  **Northside Property**

1. In this diversity case, Louisiana substantive law applies, including its principles of contract interpretation. *Bayou Steel Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 642 F.3d 506, 509 (5th Cir. 2011). Oral contracts in excess of $500 must be proved "by at least one witness and other corroborating circumstances." La. Civ. Code. art. 1846.[4] "The plaintiff himself may serve as the witness to establish the existence of the oral contract." *Suire v. Lafayette City-Parish Consol. Gov.*, 907 So. 2d 37, 58 (La. 2005). As to the second requirement, the "other corroborating circumstances" need only be general in nature but must derive from a source other than the plaintiff. *Id.*

2. The dispute in this matter is not whether a valid oral agreement was confected but whether that agreement was subsequently modified. The McClearys aver the Northside Agreement

---

[4] Article 1846 only applies "[w]hen a writing is not required by law." La. Civ. Code art. 1846. It is well-established that a real estate broker may recover commission for the sale of immovable property pursuant to an oral agreement. *See Samuels v. Firestone Tire & Rubber Co.*, 342 So. 2d 661, 662 (La. 1977).

9

|     | |
| --- | --- |
|     | was modified, whereby Hale would accept 5.526 acres of land in lieu of any further compensation in immovable property. |
| 3.  | The McClearys bear the burden of proving the parties mutually consented to the agreement as modified. *See* La. Civ. Code art. 1831; *Taita Chem. Co, LTD v. Westlake Styrene Corp.*, 246 F.3d 377, 387 (5th Cir. 2001). This consent may be manifested orally, in writing, or by "action or inaction that under the circumstances is clearly indicative of consent." *Taita Chem.*, 246 F.3d at 386 (quoting La. Civ. Code art. 1927). Silence is indicative of intent when it leads the party seeking modification to reasonably believe the offeree has consented to the modified agreement. *Taita Chem.*, 246 F.3d at 386–87; La. Civ. Code art. 1942; *see also Cajun Constructors, Inc. v. Fleming Constr. Co., Inc.*, 951 So. 2d 208, 214 (La. Ct. App. 1st Cir. 2006) ("[M]odification can be presumed by silence, inaction, or implication."). A party asserting modification of an oral agreement must also satisfy the requirements of Article 1846. *See Biedenharn v. Culp*, 911 So. 2d 313, 318–20 (La. Ct. App. 2d Cir. 2005). |
| 4.  | The McClearys have carried their burden of demonstrating modification of the Northside Agreement. Hale agreed to accept 5.526 acres of land in lieu of receiving one lot in each of the Mulberry Subdivisions. |
| 5.  | Hale manifested consent to the modification both orally and by action/inaction. |
| 6.  | As to the former, Hale approached P. McCleary and requested to modify the Northside Agreement such that Hale would receive certain immovable property in lieu of any lots in |

future phases. The McClearys agreed to this modification.

7. The surrounding circumstances corroborate P. McCleary's testimony, as required by Article 1846. The timing of Hale's request for the cash equivalent of one lot in the Mulberry Subdivisions is strong evidence of modification. Hale did not request a lot in any of the Mulberry Subdivisions before the last lot was sold. Had Hale believed he was entitled to a lot, surely he would have said something before or immediately after the last lot was sold in each phase.[5] Instead, Hale waited until August 5, 2013—the date his third amended complaint was filed in the record—to make formal demand. Hale could offer no credible reason for waiting more than 4 years after the last lot was sold in Mulberry Estates Phases B and M, and approximately 5 years after the last lot was sold in Mulberry Gardens Addendum 1-Phase B.

8. Moreover, after the phases were developed and the lots sold, Hale invited P. McCleary to be a co-owner of the Terracane subdivision. Had Hale truly been upset about not receiving lots in the Mulberry Subdivisions, it seems unlikely that he would extend a partnership offer to the man that slighted him.

9. Despite the foregoing, Hale contends acceptance of the 5.526 acres of undeveloped land on the Northside Property did not modify the original Northside Agreement. Rather, he

---

[5] Indeed, Hale received a lot in Phase A approximately two months after the phase was approved.

11

avers the land was given as reimbursement for his proportional cost of the sewer lift station.

10. The Court disagrees. The McClearys only owed Hale $46,973.30 for the sewer lift station, yet the cost of the land allegedly transferred in satisfaction of this debt was $66,312.00. Hale has not adduced evidence sufficient to explain why the McClearys would give Hale property worth significantly more than the amount owed, *and* continue their pledge to provide one lot in each of the Mulberry Subdivisions and a 5% commission on all lots sold.

11. The Northside Agreement was modified. Therefore, the McClearys do not owe Hale any further compensation for his work on the Northside Property.

**II. Southside Property**

12. Whether Hale is owed real estate commissions for his work on the Southside Property depends on the nature of the listing agreement between he and Defendants. Louisiana law essentially recognizes two broad categories of listing agreements: exclusive and non-exclusive. *Cf. Whitlock Realty & Constr., Inc. v. Sparks*, 419 So. 2d 130, 132 (La. Ct. App. 2d Cir. 1982). Under an exclusive listing agreement, the broker is entitled to commission regardless of whether his efforts contribute to the sale. *Barnett v. Saizon*, 994 So. 2d 668, 673 (La. Ct. App. 1st Cir. 2008); *Sam Fullilove & Assocs., Inc. v. Day*, 639 So. 2d 801, 803 (La. Ct. App. 2d Cir. 1994). If the listing agreement is non-exclusive or "open," the broker may only recover commission if he is the "procuring cause" of the sale, *i.e.*, if he ultimately

        brings the parties together. *Lee Eyster & Assocs., Inc. v. Favor*, 504 So. 2d 580, 581 (La. Ct. App. 4th Cir. 1987); *Dickerson v. Hughes*, 370 So. 2d 1301, 1303 (La. Ct. App. 3d Cir. 1979).

13. Hale argues the Northside Agreement was exclusive. Defendants contend the agreement was non-exclusive. As the party demanding performance, Hale bears the burden of proving the obligation. La. Civ. Code art. 1831.

14. Hale cannot carry his burden of proving the Southside Agreement was exclusive.

15. Although most of the prior verbal listing agreements between the parties were exclusive,[6] at least three circumstances distinguish the Southside Agreement.

16. First, the prior listing agreements on the Southside Property were non-exclusive. Specifically, Hale had an open listing agreement, pursuant to which he attempted to the sell the Southside Property to Nautilus Crane. Moreover, when a portion of the Southside Property was sold to Manson Gulf, Hale did not receive a commission.[7] These events suggest any future listing agreements with respect to the Southside Property were non-exclusive as well.

17. Second, the Defendants engaged Heck to sell the Southside Property with an open, written listing agreement that provided for a 5% commission. According to Hale, the Defendants

---

[6] Prior verbal contracts may provide corroborating evidence of a subsequent contract. *Price Farms, Inc. v. McCurdy*, 42 So. 3d 1099, 1104 (La. Ct. App. 2d Cir. 2010).

[7] As discussed *supra*, Hale was not the procuring cause of this sale.

would pay 10% commission if Heck was the procuring cause of a sale: 5% to Hale and 5% to Heck. The McClearys have never agreed to pay a 10% commission on the sale of any of their properties, rendering Hale's version of the events highly suspect.

18. Third, P. McCleary had a special affinity for the Callais family and therefore preferred to negotiate with them directly.  The exclusion of Hale from this transaction—the broker whom the McClearys had used almost exclusively in the past—further distinguishes the Northside Agreement from previous listing agreements between the parties.

19. Hale has failed to prove by a preponderance of the evidence that the Southside Agreement was exclusive.  Therefore, Hale is not owed commission for his work on the Southside Property.

**CONCLUSION**

This case tells the story of two friends who successfully transacted business together over nothing more than a handshake. Unfortunately, the story does not end well. Hale and the McClearys disagree over whether compensation is owed for Hale's work on the Northside and Southside Properties. For the foregoing reasons, the Court finds that the Northside Agreement was modified and that the Southside Agreement was non-exclusive. Accordingly, the Defendants are entitled to judgment, and Hale will take nothing from this suit.

New Orleans, Louisiana, this 29th day of May, 2014.

_____
**JANE TRICHE MILAZZO**
**UNITED STATES DISTRICT JUDGE**